Good morning. My name is John Balma. I represent the State of Arizona and Governor Jan Brewer, who's with us in court today. I'd like to try to reserve five minutes for a rebuttal if I may. That's fine. Your Honor, Arizona is trying to deal with the problems that arise from a federal immigration system that even President Obama acknowledges is broken. Arizona is a border state and it's on the very front lines. There's serious crimes that are involved in the drug trafficking, the human trafficking, human smuggling, and the other activities, the coyotes who fly. Because once an immigrant, an alien, an illegal alien is in the United States, the chances of removal are so low that basically crossing the border is the same as crossing the finish line. With a federal government that's been unable or unwilling to solve the problem, Arizona passed a public policy whereby they wish their Arizona law enforcement officers to assist in the implementation and enforcement of federal immigration law to the maximum extent permitted by federal law. The district judge, apparently deciding that Arizona law enforcement officers would forget their training or experience or the Constitution and act in an unconstitutional manner, has entered an injunction that basically preserves the status quo. And that status quo is simply unacceptable. Well, the district court just focused on four provisions, correct? Yes, sir. That's all that's at issue here. I'm sorry? We're only dealing with four of the provisions in the law. Yes, sir. Mr. Obama, let's forget about what arguments you might address to a jury or to a legislature. Tell us how Judge Bolton was wrong on each of those four, if you would, please. Okay. With respect to, I think we would first start with the proposition that this is a facial challenge. And she mentioned the facial challenge, the standard for a facial challenge, principally that there's no set of circumstances exist under which the statute would be valid, or put another way, with respect to each of these sections challenged that it's unconstitutional in every conceivable application. That's simply not true. Let me ask you this. You mentioned Salerno. Is that principle somewhat in tension with the government's argument here that these provisions are preempted completely? These provisions are not preempted completely. They, in every instance, comply with the congressional objectives. There's not one of them that does not comply with congressional objectives. They do not conflict in any way. You can comply with both state and federal law in each particular instance, and none of them stand as an obstacle to the full purposes and objectives of Congress. There is no express preemption. The only preemption would be field preemption, and that would be the regulation of immigration, which basically is just to decide who should and should not be admitted to the country and the circumstances under which a legal entrant should remain. And De Canis tells us that the rest of this is under the police power and that every regulation of aliens is not a regulation of immigration. And so we're back to the proposition there's no express preemption, there's no implied preemption, and there's no conflict preemption. Would you tailor that argument to Section 3? With respect to Section 3? The registration. Yes, sir. Arizona passed a set of standards that are essentially the same as the federal law, 1304 and 1306, and said if you're in violation of that, essentially, you're in violation of state law. Now, that is consistent with congressional objectives. Certainly, the fact that the administration doesn't choose to enforce them shouldn't mean that Congress doesn't want them enforced, particularly when you look at what Congress has done all along the way in encouraging state and local officials to assist Congress. So if you look at Section 13, well, 1644, 1357, and such. Mr. Baumann, but on that point, in Hines, the Supreme Court said that Pennsylvania, adding as a misdemeanor the failure to register under Pennsylvania's act, was treading in federal ground. We have, under Section 1304 and 1306, a well-detailed and regulated policy of what documents immigrants or aliens must carry in this country under the federal statute. What Arizona is doing is saying that's fine, but if you don't carry those, we're going to put you in jail for up to a year or fire you or fine you. Isn't that so? No, Your Honor. I think the Arizona statute has lesser penalties than the federal, and I think it goes 30 to 60 days. Nobody's talking about putting you in jail. All right. Even 30 or 60 days. It's a misdemeanor. That's what the federal government, that's what Congress, and Congress is the people that count. Congress has those penalties. They have stiffer penalties than Arizona does. And all Arizona's doing is saying comply with the rules. Is your argument that a state can take a look at whether the federal government is enforcing its laws, and if the federal government is not enforcing its laws, it can enforce the laws for the federal government? For instance, if I don't pay my income tax to the federal government, can California come along and sue me for not paying my income tax? Well, I don't think California would be particularly interested in enforcing the federal income tax, but Arizona is certainly particularly interested in seeing that the people within its border comply with the rules because Arizona is bearing the brunt of the federal government's failure to enforce it. You know, you mentioned Hines. Hines is a conflict case. Hines did not say that there was no room for the states to work in this particular area. As a matter of fact, there's a particular paragraph in Hines that says the concept of whether this is within the realm of both is specifically reserved. So Hines is a conflict case, and the statute in Hines, the Pennsylvania scheme, was totally at odds with the government scheme. This is not totally at odds with the government scheme. This is doing what Congress says. The fact that the administration won't enforce what Congress says doesn't mean Arizona should have to bear the brunt of it. How do they come in and claim preemption by saying we're occupying the field but we're not doing much about it? We choose not to enforce it. All right. How about Section 2? Section 2 is simply a codification of what people are already doing. In almost every jurisdiction, they're doing it on a discretionary basis. They're investigating suspected illegal aliens. All the 2B does is codify what both even the United States and the district court essentially said is constitutionally permissible. Well, let me ask you this question. It seems to me reasonable for them to ascertain the status of the person arrested and ascertain it from a Federal source. But there is also the provision that in the case of an arrest, the person will not be released until that status is determined. Now, I don't know any provision of Federal law that goes that far. And isn't that getting into Federal territory? The provision that you're talking about, which is the second sentence, we think has to be construed to be consistent with the first, third, and fourth sentences of that paragraph, at which point the only people who are investigated are those who there's a reasonable suspicion are an alien. Oh, that's fine. But, no, I think I want to focus on shall not be released until it's determined. Yes. And that can only be determined in the context of the Fourth Amendment. Yes. I understand all that. But how can we construe it so the detention does not exceed what would be possible under Federal law? The statute, 2B, specifically contains the provision. And basically, I can tell you, it says that it will be construed in accordance with Federal immigration law and to preserve the constitutional rights of all persons and the privileges and immunities of a United States citizen. That's part of 2B, which means it incorporates the Fourth Amendment standards. All right. Well, let's suppose a person is arrested with reasonable belief that they've committed a felony. And then they post bail and are able to get out. But then the statute says, no, you don't get out until your immigration status is determined. How do you reconcile that? Well, ordinarily, if they go to jail, somebody is going to determine the immigration status anyway because of the requirements of this international statute. I can see that, that often that would be done. But this is an absolute statement. It shall not be released until it is determined. And they're let out on bail, but then the statute kicks in, doesn't it, and say they shan't be released. Well, I don't think you can ñ if you take the other provision, you've got to go as far as the Fourth Amendment allows you, then you have to turn them loose. If you can't determine within a reasonable time what their immigration status is, that statute specifically provides that you have to turn them loose. That's the provision of being consistent with the constitutional rights of all persons. Mr. Bama, isn't it also true that if the Immigration Service were to pick up an illegal alien and were in the process of determining whether he was legal or not, the statute requires him to be presented to an officer within the shortest time possible to be admitted into bail? Yes. Isn't that what would happen here? I think the idea is to follow the usual procedures. We have reasonable suspicion. We have ñ you need ñ the next thing you need is probable cause. And then the next thing you have to do is let them go if you can't identify them. Perhaps on bail and have them released. On bail or otherwise. If they're out on the highway and you can't identify them. Would you clarify for me ñ there's some debate between the parties about just how sentence 1 and sentence 2 are to be interpreted. I'm just curious about how you envision this statute working for the officer in the field. Well, in the first place, officers ñ I'll just start with the proposition that officers certainly understand the concepts of reasonable suspicion and probable cause and the Terry stop and how long you can keep somebody. So then the statute, the second sentence, has to be construed to deal only with respect to those about whom there's a reasonable suspicion. And that's consistent with the first sentence and the third and fourth sentences. Secondly, you know, I think the Court failed to apply three principles here with respect to the interpretation. One is to interpret a statute in a constitutional manner. Two is to interpret it so it's sensible and doesn't end up with an absurd result. And three, to interpret it in accordance with the legislative intent. And when you look at this statute, the legislative intent is to deal with illegal aliens. You know, Arizona has a long and proud tradition of Hispanic population. Nobody's trying to pick on them. Now, in the case of an arrest, if you look at the statute, the statute goes on to provide that if the person stopped or arrested or detained produces a document like a valid Arizona's driver's license, that's a presumption that they're here legally. But in the case of an arrest, as Judge Noonan was pointing out, what happens if they have a driver's license, that's it. They don't have to comply with the other parts of the statute. It's all over. It's all over. It's all over, which is a lot better than the current status, because the current status doesn't give you that presumption. That doesn't seem to be what the statute says, though. Sir? It doesn't seem to be what the statute says. Well, it does. I think the statute is pretty clear on that, that if they have a driver's license, it's presumptive, it's taken care of, and they're gone. No, it says a presumption. Again, if you're going back to the concept that we're the statute is intending to deal with illegal aliens, that it is illegal aliens that we're talking about, if you try to interpret it the way that either the government or the district court does. The answer to Judge Paz's question. I'm sorry? The answer to Judge Paz's question. Okay. It doesn't say a person is conclusively presumed to not be an alien by the presentation of an Arizona driver's license. It says a person is presumed not to be an alien. That's a presumption which can be rebutted by a conversation between the officer and the alien, which indicates reasonable suspicion that he is not an admitted alien or an American citizen. You will concede that. You're absolutely right. As a matter of fact, very often in practice, the first thing that an alien tells them is that he's not a citizen. I mean, that takes care of the reasonable suspicion usually. If we were to interpret the statute in the way that is constitutional, would Arizona be bound by our interpretation? Yes. You would accept it on behalf of the state? Yes. Yes, they certainly would. Let's finally, why don't you address, there are two other provisions that the district court enjoys. Yes, sir. Would you like to talk about five? Whichever one you want to address. Okay. Well, five is the issue of whether you can make a criminal penalty for being employed. It's to attach a penalty for people who are unauthorized to work, to penalize them as a way of discouraging them from working. That is clearly consistent with congressional intent. The reason they are unauthorized workers is Congress has made it clear that they're not supposed to be working. Congress has chosen to first try to deal from the employer's standpoint, and they, in that particular instance, did put in an express preemption provision, but it was a partial express preemption provision, even with respect to employers. And they certainly didn't put any express preemption provision in with respect to employees, nor is it clear, if you look at the statute or anything Congress has done, is there any clear and manifest intent to preempt the area of employees. Congress has even put some penalties on employees for using false statements and things. This is a problem, because, you know ---- You're arguing something which is foreclosed to us. In the case of National Center, 1990, Judge Ferguson found and wrote that the congressional intention was not to punish employees. Now, right or wrong, this three-judge panel must follow that rule. We are not an en banc panel. So now tell me why Judge Ferguson's opinion in National Center does not bind this court. Well, Judge Ferguson's opinion in that instance went to the legislative intent, and to determine the legislative intent, he looked at the hearing that consisted of a five-person committee, three of whom were present. And from that, he divined the legislative intent. And that seems a long way from being clear and manifest that the intent was preempted. Let us suppose I stipulate to the fact that Mr. ---- that Judge Ferguson was absolutely wrong. You got that in mind? I agree with you, let's say. I don't, but I ---- But I say I agree with you, right? How does a three-judge panel of the Ninth Circuit overrule another three-judge panel of the Ninth Circuit on what the legislative intent was? Judge Ferguson found the legislative intent on a bail order of an immigrant, of an alien, which said that he couldn't work during the period of time of bail to be inconsistent with the legislative intent, which was not to punish workers while they were awaiting their asylum hearings or other proceedings under immigration, but to let them work and earn enough money to feed themselves and not be public charges. That was his idea. Now, Judge Ferguson, rest in peace, may have been wrong. But how can we turn that around and agree with you? I think you are in a position, should you decide, to decide that that was simply wrong. Our case law doesn't allow us to do that. We're bound by what a prior three-judge panel says. Unless there's a change in the law either by the Supreme Court or by an en banc panel or by a statute. National Immigrant Rights Center is a case that poses some problems for you with respect to Section 5. How about the final section before your time runs out? You might want to address Section 5. With respect to Section 6, that is a provision that is really consistent with a federal statute, 1252c. It permits an Arizona law enforcement officer to make a warrant less than somebody who is removable from the country. And the idea of that is to permit Arizona law enforcement officers to work with ICE and to hold suspects when ICE tells them they want them held. For instance, people who have been removed, who have been convicted of a violent crime or a public offense and who have been removed and returned or who have agreed to. Are those the same problems that Judge Noonan was talking about with respect to arrest and detention? I don't believe it does, sir. Why not? Well, this is somebody that ICE wants held. This is somebody who has committed a public offense and has either been removed or returned to the country. It's not restricted to that. And, therefore, illegally and is subject to arrest and detention. Excuse me. It's not restricted to returnees, is it? No. It could be somebody. But that is an example. Somebody who's absconded and not gone or somebody who has gone and returned. Either one would apply. They're both clearly removable. Well, it also goes to somebody who is arrested. They run a national crime information center check, and they find that he was convicted, sentenced, served his term for second-degree murder, and is free. Your Arizona policeman can arrest him because he's removable. That's right. For an aggravated felony under 1227 of the INA. That's right. And the judge made it appear the district judge made it appear very complicated about who was removable and who not. But the juror tells us it isn't. It may be clear in some cases, like murder or bank robbery or sexual abuse of a minor, which are all causes for removal, even though the sentence has been served. And it may be unclear in other cases. But this is a facial challenge, isn't it? And that's my point. That was about the point I was to make. You consider that a right one? There are constitutional applications, clearly. The ICE maintains a database of people who have been removed and a database of those who have been convicted of those kinds of crimes. But hasn't the Federal Government, through a very elaborate scheme, established a lengthy process for determining whether somebody is removable or not? There's a lengthy process. It's not an easy call whether somebody, just because somebody has committed a crime – I mean, there's some that are obvious ones that Judge Baird alluded to. But there are many that aren't. We debate among ourselves whether or not a particular offense is a crime of moral turpitude or is a serious felony. Well, the Illinois court, Justice Davis made it clear that there's a whole lot of areas that are pretty clear. But I guess the main point is this is a facial challenge. And that's the main point with respect to each of these. It's a facial challenge, and there are certainly circumstances in which it could be applied in a constitutional manner. It is not all – it is not unconstitutional in every conceivable aspect. Well, I'm still trying to understand how this statute works. That is, so an officer determines by running a data check that somebody has been convicted of a crime, and they're going to be charged with a crime of moral turpitude or a crime of moral turpitude, or whatever you want to – whatever crime you might want to pinpoint. They take them into – they arrest them without a warrant? They take them into custody. And what do they hold them for? Well, let's suggest that they – What do they hold them for? Well, let's suggest that before they arrest them, they ID them. They have a reasonable suspicion. They've got to have arrest – pick them up for a lawful stop or detention or arrest. And then they have to have a reasonable suspicion. Now they've checked with ICE. They found out who the individual is. And that's important, because until they do that, neither ICE nor they know who they have. It's the theory of Congress in encouraging the communications with ICE, because you don't know who you've got. You can't catch them unless you know about them. And so they've reported that to ICE. Now they both know who they have. Now ICE says, we want to hold him. He was supposed to be out of the country or he was out. Suppose ICE says, we don't know whether or not this is a – I'm sorry? Suppose ICE says, we don't know this is a removable offense. Well, then you couldn't – We need to check. Then you couldn't – then if you're going to talk about people acting in a constitutional manner and get back to the fact that you assume they will, and secondly, that this is only a facial challenge and there are constitutional applications, this law can be applied in a constitutional manner and you'd assume that the police officer would let that individual go. So how long does ICE have to get back? Well, that depends upon the circumstances. 24 hours? 48 hours? A week? No, I think that if you're talking about reasonable suspicion, probable cause, it's less than 24 hours in both. The truth of it is the experience – you can look at all the statements that have been submitted. They usually get an answer back from ICE in something less than 11 minutes. Okay. All right. Well, do you want us to – I'm past my – Yeah. Do you want us to construe the statute so it can only operate after the Arizona officer asks ICE for a ruling? I don't think it's the only time it might happen because, as I say, Padilla says there are some relatively clear things. They could perhaps arrest him. But the concept is basically to provide the authority that is required if you're going to implement the federal statute, 1256C. That needs to have state authority. There may be state authority. We just don't know. But this is to clarify that. And I'm way into my – Yes. Okay. Thank you. Thank you, Counsel. Good morning, and may it please the Court. Edwin Kneedler for Appley United States. Before discussing the particular four provisions at issue here, I would like to first lay out the constitutional structure and preemption provisions that we think govern the validity of those provisions. The Constitution of the United States vests the subject matter of immigration in the national government. That's because – No. National government? No. In Congress. In Congress. Yes. There's a big difference between the national government and Congress. Well, Congress in the enactment and the executive branch in the execution of the law under Article II. And the interference with the execution of the law is part of our submission  So long as the execution of the law is done fairly and well. Yes. And this is because the subject matter of immigration, which, after all, is the treatment of foreign nationals and nationals within our own borders, is a core aspect of foreign relations. And, indeed, one of the purposes for adoption of the Constitution was a concern that individual states might embroil the entire nation in disputes with other countries. And it's, therefore, important not to allow for a patchwork of state laws, but rather for the nation to speak with one voice. And, in this context, it's particularly important to protect the rights of U.S. citizens abroad in their reciprocal treatment by other nations. Mr. Manley, has there been any adverse foreign relations since the year 2007 when the state of New Jersey adopted by order, but not by statute, a similar requirement to its police force that anyone who was stopped for an inappropriate driving should have his immigration status checked? Well, I'm not aware of a level of dissatisfaction or concerns that has arisen now. Now, secondly, how about the same rule in Rhode Island? Has that led to our foreign relations being deteriorated as a result of checking immigration status? There have been concerns expressed in recent years. As to Rhode Island? Well, I'm not sure specifically. As to New Jersey? I'm not sure. Or only as to Arizona? The declaration submitted by Deputy Secretary Steinberg explains that this particular law has brought to the fore a broader concern. Those concerns would be applicable to any such law. Mr. Kneedler, let me ask you. Has any other state, New Jersey or Pennsylvania or Nevada or any other state, ever issued a declaration that the legislature declares that the intent of this Act is to make attrition through enforcement the public policy of all state and local government agencies in Arizona? No. And I think that's an important point. This is an extraordinary state statute that enacts a combination of additional  enforcement scheme for mandatory checks with DHS any time there is a stop and reasonable suspicion. Section 1 of the Act describes that these provisions are designed to work together to adopt attrition by enforcement and to adopt the public policy of the State of Arizona that is independent and outside the control of Congress and outside the control of the national government. Is that part of the statute? Pardon me? Do they say we're going to operate outside of the control? I mean, don't put words into the statute. I mean, that's rhetoric, not statutory rhetoric. Well, it's a description of the consequences of what happens, because if I could explain for you. No. We're well aware of this. Why don't you concentrate on the provisions that you've provided? I would like to switch to Section 3 in particular, which establishes a state crime for failure to register or carry a registration card as required by the federal criminal statutes. But it only applies to people who are unlawfully present in the United States. So, in effect, it criminalizes unlawful presence. Those prosecutions are brought by the state. They are not subject to the control of the United States government. We think that's preempted clearly for three reasons. First of all, it is a direct regulation of immigration. The Federal provisions 1304 and 1306 that are cross-referenced there are part of Congress's comprehensive and direct regulation of immigration. It follows that the State's imposition of criminal sanctions over and above and on top of those same State prohibitions are themselves regulations of immigration and preempted. Mr. Kneedler, I don't want to speak for my colleague, but I don't think you have to spend a great deal of time on Section 3. Okay. I do want to make the point, though, that the other provisions of the Act, particularly Section 2, was designed to work in tandem with Section 3, so that if there was a stop and somebody's ---- But one point that Arizona makes with respect to Section 3 is that it does nothing more than to complement what the Federal scheme. Well, in Hines v. Davidovitz, the Supreme Court said that the registration scheme at issue there, and this was built on top of that, does occupy the field. And the Court specifically said that a State may not complement or add auxiliary regulations, and additional criminal penalties on top of that we think are exactly that. But in addition, there's conflict preemption here, because the effect of the provision is to criminalize illegal presence in the United States, because it only applies to people the State statute does, only applies to people who are lawfully present. As we explain in our brief, it is contrary to the policy of the United States in statutes and consistent with international practice not to criminalize mere presence in the United States. And so for all of those reasons, we think that Section 3 is preempted, because it is direct regulation of immigration. If I might, unless the Court has further questions on Section 3, I could switch to Section 5 of the statute, the employment provision. With respect to Section 5, as the Court pointed out, this Court's decision in the National Immigrant Rights case did analyze the backdrop in the enactment of the Federal prohibition, the employer-sanctioned provision, and recognized that Congress had considered but deliberately rejected the possibility of imposing sanctions on individuals. Well, I think you heard Judge Beyer. It's common ground. We abound by that decision. End of argument. Yes. You don't need to say that word more. Why don't you go on to 2? If I could just add one point on that. On Section 5, I might. You have to do it. No, but I'd like to underscore one point that I think reinforces why the Court was correct in its evaluation, and it's not just a legislative history point, which the Court addressed in the NCIR case. And that point is that the 1324a of the Federal Act has a specific prohibition requiring an individual employee to attest that he is lawfully present and authorized to work, and there are criminal sanctions under the Federal Act for violating that provision. Significantly, there is another provision in 1324a that says the attestation that the individual employee makes may not be used for any purpose except to enforce the Federal statute. And to us, that clearly shows that Congress contemplated that the employee's involvement and the attestation that he has to make in connection with applying for employment could only lead to Federal consequences and that there would be no State consequences. That's a point that was not made in the NCIR point, and it is a textual point right in the face of the statute. Kennedy, you mean to say that if there's a perjurious declaration, the State in which that perjury is committed cannot prosecute it? I believe that is probably correct, but putting that to one side, it cannot make the employment itself unlawful, whether or not it could punish the making of a false statement. Why do you believe that a State could not prosecute a perjury committed on a Federal document? Well, if it's regulating perjury against the United States in the same way that Section 3 is preempted, so would that be. It's not up to a State to prosecute false statements made to the Federal government. Do you have any authority for that? The Supreme Court's decision in the Buckman case, it dealt in the civil context, but it was a case involving fraud on the FDA. And the Supreme Court said that the relationship, specifically in the context of fraud between a Federal agency and those whom it regulates, is a matter to be addressed by the Federal government, and the State could not create a civil cause of action for fraud. And, again, there's no need for the Court to decide that here, but I think that's not true. I'm not talking about a civil cause of action for fraud. I'm talking about a criminal penalty for perjury. Well, but again, the question is whether the State would have authority over the subject matter, whether it does that by criminal or civil means, we don't think would have it. Is there a case that you have in mind where the State is found not to have ability to prosecute somebody who perjured himself to the Federal government? I'm not aware of a specific case, but, again, that relationship, we think, would ordinarily be governed by Federal law. So I've addressed the two substantive criminal provisions that the State has engrafted on top of the comprehensive Federal scheme. Now, if I may, I'd like to turn to section 2B of the Act, and that is the question that's being asked. As you do, as you talk about section 2B, I'm interested in how Salerno fits in to this scheme. Well, we believe that this statute is preempted on its face, and we believe and let me explain why, and I think it's consistent with the Salerno formulation. Do you stipulate that this is a facial challenge? Yes, it is a facial challenge. But we believe this provision is unconstitutional in every application, and here's why. What we object to and what is preempted in this context is the mandatory nature of the requirement. We do not question the authority of the State to – a State law enforcement officer, for example, in the course of an ordinary stop or either a traffic stop or stopping someone on the sidewalk in a terry stop, to question someone about his identity, about his status, and to check with INS, excuse me, DHS, because indeed, Federal officials rely often upon information gleaned from State and local law enforcement. What is problematic about this is the mandatory nature of it, because what the Federal law enforcement officer is doing is using the State's mandatory criminal enforcement apparatus in aid of this separately constituted State mandatory criminal enforcement approach to the immigration laws. Let me ask you – I know that's the theme of your brief, but why does it harness it? Isn't Congress capable of saying no, if this is a burden? Congress could, but we think Congress already has said no. And let me – Well, is there anything in the statute in the heading that you won't tell us that's interesting? Yes, there is. And we think where it is manifested most clearly is in the provision of the Act, Section 287G, it's called, or 1357G of Title VIII. And the first nine sections of that provision established – and this was enacted in IREA in 1996 – established a mechanism under which DHS through ICE can enter into a cooperative law enforcement agreement with a State and local either law enforcement agency or correctional agency. And under that provision, the State officers may exercise authorities of ICE officers, including in fact doing checks in appropriate circumstances. But the Act makes clear that where there's an agreement like that, the State and local officers have to act under the supervision of ICE officers and have to follow ICE priorities in terms of law enforcement. But not under G-10. Well, under G-10, it says, notwithstanding, no provision of this Act, I think that it says, will stop the – nothing in the subsection shall be construed to require an agreement under this subsection in order for any officer or employee of the State or political subdivision of the State to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States, or otherwise to cooperate with the So 287G officers are under the AG, but under G-10, this doesn't stop regular officers from doing exactly what I've read. And our position is not that they're not authorized to. Our objection is that the State statute mandates it. Well, it's up to the State how they want to use their people, right? Well, I don't think so, with all respect, because it's not the State that's going to do it. If one looks at 10b, it's true, an agreement is not required for State officers to cooperate, but the pertinent language, the important language is cooperate with the Attorney General. When one sovereign utilizes its law enforcement officers to assist a second sovereign, I think that the background understanding would be that it's the second sovereign whose laws are being enforced who would take the lead, and the other officer here, the officers of Arizona, are assisting the second sovereign, the United States. That's all very nice and well as to subsection b, but listen again. To communicate with the Attorney General regarding the immigration status of any individual doesn't say to communicate when the Attorney General wants you to communicate or wants you to cooperate to communicate. This is a right under the Federal statute for the local people to communicate with the Attorney General. Section 10 contemplates that that will be part of a broader cooperative relationship. And I think, again, this is demonstrated, I think, by the text. Paragraph a says to communicate with the Attorney General, and then b says otherwise cooperate, otherwise to cooperate. Kennedy, besides communicating. Well, but the otherwise to cooperate, the otherwise refers back to a. The communication is part of the cooperative relationship between the State and the Federal government. Isn't the obligation of the Federal government made very clear by sections 1373c, 8 U.S.C. 1373c, which is entitled obligation to respond to inquiries. The immigration and naturalization service shall, mandatory word, respond to an inquiry by a Federal, State, or local government agency seeking to verify or ascertain the citizenship or immigration status of any individual, et cetera, et cetera, et cetera. It doesn't say when we want to. It doesn't say in our discretion. It doesn't say when we have funds available. It says shall. Our point doesn't turn on the response that DHS makes. It turns on the antecedent conduct of the State and local police officers who would be, by hypothesis, are making inquiries of the alien before we even get to what would be submitted to ICE. They would be stopping someone and prolonging that stop by hypothesis and circumstances that they might not otherwise do it in the absence of 1070. They might not do it or they might do it, and this is a facial challenge. So you've got to prove that every time they would stop someone, that would be an unconstitutional stop. No. No. Our burden is to show that every time the mandatory application is impermissible because it takes away the discretion of the local law enforcement officer to decide whether to pursue a particular line of inquiry rather than mandate. What about the first sentence of section 2? It says if you have reasonable suspicion, if it's practicable, if it won't interfere with the investigation, then you can request his immigration status. But in those circumstances, it is mandatory, and those parts of the first sentence do not provide for the State or local officer to take into account Federal priorities. The only thing that can be taken into account are the State or local law enforcement officers' own set of priorities. What Federal priorities? Well, the as we explained in our brief, the Secretary of Homeland Security through ICE has established priorities, for example, in the enforcement of the Immigration Act. But there can be no priority established under ICE or by ICE as to responding to the obligation to respond to inquiries. Yes, this is what I'm describing here doesn't go to ICE's response to the inquiry. It goes to the antecedent conduct by the police officer when he encounters someone on the beat in the neighborhood or stopping a car, what does that officer do? You want him to say what would the Feds do in this case? No. I think what we would want him to say is what would I do if left to my own law enforcement judgment, knowing what the Feds' approach is with particular, with respect to particular problems. You've been told what to do. You've been told by the Arizona legislature and by the Governor what to do, which is if you have reasonable suspicion, if it's practical to do so, if it won't interfere with the investigation, run an immigration check. It takes 11 minutes, according to the last speaker. And again, our problem is that the State has mandated it. And what it has done now is to say, well, let me ask you, let me ask you, let me ask you, suppose before Arizona passed this statute, this provision, and let's assume no agreement, no cooperative agreement, could the sheriff of some local county say to his officers, whenever you make a stop and you think there's reasonable suspicion that the person you stopped is here illegally, you run a check with INS? I think that would present the same problem. Why? Because the It's not mandatory. The State hasn't said it's mandatory. Well, but the sheriff has. And if the sheriff adopts a policy, and for these purposes and in others, I think a policy by the sheriff or the department on how matters are to be conducted should be regarded as having the force of law if it's intended to bind the officers who work for him. It's just a priority. It's just, you know, the sheriff has decided in his discretion as he's running this department and directing his officers. Well, but the In that situation where the It's not solely the sheriff's concern when it comes to the enforcement of Federal immigration law. Well, suppose the sheriff hasn't issued such a policy statement. And the officers just say, well, on our own, you know, I made a stop here. It looks like this guy's illegal. He said he's not here. I'm going to call INS. I'm going to call. I'm going to check. What's wrong with that? Well, you know, at some point, the, you know, at some point what an individual officer does, you know, may not rise to the level of a legal problem, but even in the case of an individual officer, if there was an issue, that would be worked out in the cooperative relationship between the Federal government and the State. There's another I don't understand why an officer couldn't, independent of this law, and even in light of the existing Federal laws that we've been talking about, couldn't on his own decide to call ICE about a particular person he's detained? He certainly can't. Let me, let me just. It seems to me to be perfectly permissible. It is permissible. There's another aspect of the State statute here which we think is really important in underscoring what Arizona is trying to accomplish here, and that's the private right of action. Now, Mr. Kneedler, let's not get away from this point, because I've read your brief. I read the district court. I've heard your interchange with my two colleagues, and I don't understand your argument, and, you know, we are dependent, as a court, on counsel being responsive, focusing, trying to help us not go down just fall like soldiers in defense of some position that has been told, that has been told that. You keep saying there's a problem that a State officer is told to do something. That's not a matter of preemption. If the Federal government wants to preempt this field, Congress can say so. We cut off communications. We don't want to have this information sought, but it hasn't done so. The judge may have made very clear to you, it has not done so. And the – I would think the proper decision would be to concede that this is a point where you don't have an argument. Kneedler, With respect, we do believe we have an argument, and if I could make two other points that we think critically underscore that. First of all, the mandatory nature of Section 2B is coupled with the private right of action later in Section 2, which provides that any citizen of the State, not just the sheriff running the department, but any citizen of the State can bring a private right of action if there is a policy of not enforcing the State – excuse me, the immigration laws to the maximum extent possible. So this builds in a powerful incentive for a State or local officer to pursue questioning in circumstances which ordinary law enforcement would not call for. The State has singled out this one subject matter of immigration for this extraordinary mandatory requirement in a subject matter that is an exclusively Federal subject matter in its prosecution and enforcement. The other thing that is extraordinary about this is it is geared to the reasonable suspicion standard. That is a familiar standard, but it is a familiar standard in terms of authorizing or permitting law enforcement. It is a purposely low standard, far lower than preponderance, lower than probable cause, but it's a standard that – whose application daily depends upon the individual judgment of law enforcement officers in the field, often not exercising that power to the hilt because of a recognition that maybe they should be applying a standard somewhat above this. This standard is now being transposed from what was – from a permissive authorization in its usual application to a mandate every time a State or local officer encounters someone on a beat, and the circumstances, all the circumstances might lead to a judgment that there's reasonable suspicion that that person is unlawfully here. That officer must pursue the matter and ask questions when the officer would not otherwise do so. Kennedy. Would it be similarly impermissible if the State of Arizona were to say, every time you stop or detain or arrest a person, you have to check him with the National Crimes Center? To see if there are any outstanding warrants? That is a regular part of police practice. Or every time you stop a person, you've got to take his fingerprints? Is there anything wrong with that? No, but in that circumstance, the State is regulating its own State law enforcement. If the State wants to say every time you stop a person. Not necessarily. If the National Center has outstanding warrants from the State of California, that's not an Arizona crime. No, that's the information the officer might find from the NCIC. But in terms of pursuing the NCIC, what's different about this is the State has singled out immigration and said you will pursue immigration in a way that you won't pursue any other State or Federal responsibility. I don't think the State has any interest in seeing that illegal aliens are removed from the State of Arizona, even though many of them are also criminals? The State certainly has an interest in that, but it's important to focus on the fact that the encounter between the local law enforcement officer, maybe on the street or in school with a student who's been in a fight, and the officer may have some suspicion that that student in school might be unlawfully present. All of a sudden, this law requires that that incident be pursued by the officer. But all of that is geared not towards something that the State can do. The State cannot remove the person. The State cannot prosecute the person. It is all an intake for ultimate Federal enforcement of the law. But the State can deliver an illegal alien over to the Federal officials, and that may result in that person being removed from the State of Arizona. But in the field, the cooperative relationship against which all Federal-State cooperation in law enforcement works is there's communication about that. Before the person would be brought to ICE, there would be communication between the local law enforcement officer and ICE saying, what do you want me to do in this circumstance? What this provision does, 2B does, in the words of Hines, is stand as an obstacle in every encounter to the cooperative relationship between the States and the Federal government, because it creates a State enforcement priority and a State mandatory enforcement approach backed by this private right of action and geared in an unprecedented way to the use of the reasonable suspicion standard, which, as I said, has always been one to authorize but not used in this way to compel law enforcement officers. And the consequences of that are the following. And I'd like you to respond, for a few moments, to the arguments advanced with respect to Section 6. Okay. With respect to Section 6, it presents the problems that the district court identified for starters. The party, as the district court pointed out, the Section 6, the parties agreed in the lower court, was geared to the situation where the crime might be committed outside of Arizona, because there was already authority within the State of Arizona to arrest someone, to make a warrantless arrest of someone. Not if that person had already served a sentence. Arizona couldn't allow a warrantless arrest of somebody's sentence. Right. No, no, that's a matter of fact. But this section does allow that. No, that's true, but that is not a justification that was put forward in the lower court. It's a justification that the district court talked about in its opinion. She noted that specifically in her opinion. She noted it, but the parties didn't address it. Right. And if that's an additional justification, that's something that could be considered. This is just a preliminary injunction stage, so that's something that could be considered by the court. Well, but you're sure you're likely to win, and that would be, if that consideration were considered, you'd be likely to lose. No, I think it continues to present the problems that the court identified, because there's no requirement in Section 6 that the State or local officer contact the District Court in order to find out whether an offense is removable. The individual would – the officer would have to make a judgment as to whether the public offense in the other State was also a public offense in Arizona, and then determine whether it would, in turn, lead to a removal. Suppose the response is like Judge Baez suggested earlier, second-degree murder was the crime. Well, in some – in that situation, it would probably, you know, it would probably be possible to make that determination. Then why does – so then doesn't – don't you have a Salerno problem with respect to Section 6? Well, I – I don't think so, because the – because the – there's no requirement to check with ICE, first of all, and the INA vests that responsibility for making removability determinations in the Federal Government. There may be some situations in which something could be done otherwise. If I could just make a final point about the – You're pretty much conceding that, then? No. We believe there might be some circumstance in which it could, but that that should be sorted out on remand. If I could just again come back to Section 2. Is that a concession? Pardon me? Is that a concession? It's not facially invalid? Well, it's not written in a way that takes account of those circumstances. That's the problem with saying it's not facially invalid. If it was written in a way that required that ICE be consulted before the conduct was taken, after all, it's a statute that focuses only on aliens, and that's the – that's the concern. So if it was written in a way that required that trigger, we think that it might be different, but it's not. If I could just come back to the – Could it be construed that way? Pardon me? Could it be construed that way? I don't believe it could be. It's not a question of construing the order to put it in there. You heard the counsel of the State. Arizona seems quite willing to accept our construction of the statute. Well, I think that's on – they've discussed that in 2B. In 6, I think there's simply no language that could be read into the statute or construed to require a prior checking with ICE. But you look at the statute as a whole. The whole thrust is to communicate with the Federal Government. But there's no requirement that that be done before the local officer make a judgment on its own. And we think that's contrary to the general cooperative law enforcement. If I could just return to 2B for a moment, because that's – I see my time is – Yes, you're just – I've let you go one minute. But make your point, and then that's it. I just wanted to say that the Arizona statute here, with its extraordinary mandatory investigations, has to be considered in light of what would happen if every State in the Union did this. And the United States nation as a whole is responsible to other nations for the ways in which their citizens are treated within the – within the United States. If every State did this, we would have a patchwork of laws, as the Third Circuit's decision in Lozano, which struck down a similar law, concluded. And it's also important, as this – as the Supreme Court recognized in Hines v. Davidowitz, to recognize how a statute like this can affect lawful permanent residents and citizens, because another important factor underlying our immigration laws is to respect the civil liberties and not subject people to interrogations and to police surveillance. And this statute, because of its mandatory requirement based on minimal reasonable suspicion, we think raises that concern very profoundly. Thank you. Just a few quick points. Sure. The – this is about reasonable, minimal – the reasonable test of minimal reasonable suspicion. You know, INA – I mean, INS Lopez took care of that, the – INS Lopez Mendoza. The courts – the Supreme Court specifically said that reasonable suspicion was a – was a sufficient standard to protect those lawfully within the country. So it's been a time-honored standard. I don't know how suddenly it becomes so minimal. Secondly, it's pure speculation – and again, we're talking about a facial challenge here – but it's pure speculation that police officers are now going to check out people that they otherwise wouldn't have checked out in their discretion. The idea of this statute is to prevent those people who have previously been subject to sanctuary city policies to make those checks. The third thing – It does say a reasonable attempt shall be made in Section 2. Yes. And if – It does say shall. Yes. We encourage them to do it.  That's a generous reading of shall. Thirdly, it is a – But I'll take it. I'm sorry? I'll take it. Thirdly, you mentioned the National Center case, and I just had to look at it during the argument a little bit. I guess the point I would emphasize is that the – that particular case addressed whether the DHS had the authority to enact those regulations. It did not address the subject of whether the states, in the exercise of their police power, as indicated by Dukanis and other cases, could address that particular subject. And the National Center case also failed to apply the presumption against preemption of state law, because they weren't dealing with state law. They were dealing with an administrative – Mr. Bowman. – application. If Judge Ferguson analyzed the congressional intent as to whether to punish employees as a condition of bonding them out, right? Yes, sir. Why isn't that general premise, what the intent of Congress was, applicable not only when DHS does it, but when the state does it? Well, DHS doesn't have any police powers to begin with. Secondly – But we're dealing now with the intent of Congress. If the intent of Congress is found to be black by Judge Ferguson, just because it's in one room or another room, DHS or the state, doesn't stop it from being black. I was trying to address your question about, even if you agreed with me, which you weren't sure you did, about the legislative history, whether you were bound by that opinion. And my answer would be, I don't think you are, because he did not address the specific subject before you. He did not address the subject of the presumption against preemption or the police powers of the state. And I think he was wrong, with all due respect, on legislative history. And when you take a five-person committee, three people present, and say that's the legislative history, that's a little bit of a stretch. We're – Your time – you're over your time, so I'll give you a minute to just sort of sum up your points. Okay. Your Honor, it's a facial challenge. We think that all these four provisions are consistent with congressional objectives. It's congressional objectives that count, rather than this administration's priorities. And you know, there are – there's no reason why Arizona should stand by and suffer the consequences of a broken system when Arizona has 15,000 well-trained and capable police officers, law enforcement authorities, on the ground who can help fix the system. And that's what Arizona wants to do. So we ask that you vacate this adjunction and allow Arizona to get on with taking care of the health, safety, and welfare of its citizens, and I appreciate your time. Thank you. Thank you. I appreciate – we appreciate your arguments. The matter will be submitted at this time, and the Court appreciates the vast interest in the case. Thank you. We'll be in recess for 15 minutes.
judges: Noonan, Paez, Bea, Cjj